UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiffs,

vs

ALBERT STEVEN BATES and
WALTER JOHN BATES,

        Defendants.
_____/

No. 02-80948
HONORABLE ARTHUR TARNOW
HONORABLE R. STEVEN WHALEN

### DEFENDANTS' POST-HEARING BRIEF REGARDING SANCTIONS

Following the January 27, 2005 hearing on sanctions, this Court (Magistrate Judge Whalen) directed the parties to address (a) whether there was a Rule 16 violation, (b) whether the defendants were prejudiced, and (c) whether sanctions are appropriate.   In connection with the foregoing issues, the Court also asked the parties to address the impact of Agent Mangan's concession that he was aware of the results of the Albert Bates/Foster-Bey fingerprint analysis by Sgt. Morden (Government's Exhibit 2) as early as April, 2004.  This brief will address those questions.

In addition, Defendants maintain that FBI and/or AUSA misconduct occurs where the government acts deliberately so as to avoid taking possession of reports of scientific testing (particularly exculpatory reports) in order to circumvent its obligations under Rule 16.  When that misconduct is compounded by the government's introduction of knowingly false testimony, a defendant's Due Process right to a fair proceeding is violated. Defendants maintain further that where such misconduct occurs,

1

sanctions may be imposed either under Rule 16, or under the Court's inherent supervisory authority.

Defendants have offered an extensive factual summary previously in earlier pleadings, which is incorporated herein. The vast majority of information conveyed in those pleadings was confirmed during the sanctions hearing, or was confirmed through the government's own filings. If anything, the hearing in this case exposed more significant misconduct by the government. Defendants offer the following limited additional factual summary and legal argument in support of his motion for sanctions.

## A. Agent Mangan's false testimony during the hearing:

Early during cross-examination, Agent Mangan was given a clear opportunity to acknowledge that as early as April 7, 2004, Sgt. Morden had disclosed to him the results of his fingerprint comparison between the ""fingerprint-in-glue" and the inked fingerprint impressions of Albert Bates and Kevin Foster-Bey.

> DEFENSE COUNSEL: Now I want to go [to] what happened between the second and third request.
>
> THE COURT: Again, for purposes of clarification, the third request you're talking about is Government Exhibit 2?
>
> DEFENSE COUNSEL: That's correct.
>
> THE COURT: Okay.
>
> DEFENSE COUNSEL: All right. Now I will focus in on when you learned of the results of the second request, and again, we made that distinction. **When did you learn of the results of the second test, the Albert Bates test?**
>
> AGENT MICHAEL MANGAN: **After July 8, 2004.**

2

(Mangan, Tr 1/27/05, p 37). This testimony is knowingly and demonstrably false. Later during cross-examination, Mangan was forced to concede the obvious -- (a) that the Walter Bates comparison would not be necessary if either Albert Bates or Foster-Bey's fingerprints matched the "fingerprint-in-glue" stain, and (b) that therefore, Mangan did not request the Walter Bates fingerprint comparison until after he learned of Morden's findings with respect to the Albert Bates/Foster-Bey fingerprint comparison. (Id 37-39). Sgt. Morden also confirmed that Mangan specifically asked to be given "a heads up" as soon as Morden had a result (as to the Albert Bates/Foster-Bey fingerprint comparison), that Morden did tell Mangan about the Albert Bates/Foster-Bey test results, and that Morden needed Mangan's direction (and another suspect's inked impression) before testing further. (Morden, Tr 1/27/05, pp 103-105).

During this hearing, both AUSA Deegan and Agent Mangan appeared to be attempting a distinction between awareness of test results as opposed to knowledge of a "report". (Deegan, pp 29-30). This tortured distinction does nothing to excuse Mangan's false answer. First, defense counsel used the phrase "results of the ... test" in the question posed, avoiding any troublesome reference to the word "report", and still Mangan denied knowledge, falsely, under oath. (Id 37). Second, the illusory distinction between "report" and "result" is irrelevant given Sgt. Morden's later testimony. Morden's testimony and the face of the report itself reveal that the Morden's "report" was completed on April 7, 2004,

3

and the Morden-Mangan discussion took place almost immediately thereafter. (Id 105). While administratively, the report had to be reviewed before being mailed out by the Lab, Morden's "report" itself was complete (and typed), on April 7, 2004. (Id). Consequently, Mangan's attempt at explaining away a dishonest answer by making this distinction likewise fails, and the explanation itself is a dishonest answer which compounds his misconduct.

## B. The effect and relevance of failure to disclose:

### 1. Relevance of negative fingerprint comparison:

As discussed in earlier filings, the negative results of "fingerprint-in-glue" comparison undermines the government's case against these defendants. Put simply, there are three alleged co-conspirators in this case. The robbers used glue to cover their fingerprints. The government used the glue evidence to obtain search warrants, to indict, and to seek the detention of Walter Bates. The "fingerprint-in-glue" stain matches none of the alleged co-conspirators. It is exculpatory evidence, and Agent Mangan considered the glue evidence "important".

### 2. Relevance of Mangan cover-up of fingerprint findings:

Above and beyond the significance of the negative fingerprint comparisons, Mangan's attempt to conceal this exculpatory evidence is itself significant. Agent bias is relevant.[1] Agent Mangan will

---

[1] The defense is entitled to unearth bias in the investigation because bias is always material. The bias of a significant witness in a criminal trial is never a collateral matter. United States v Mayer, 556 F2d 245, 248 (5th Cir 1977). See also Uforma/Shelby Business Forms, Inc. v National Labor Relations Board, 111 F3d

4

be a significant witness at trial, second only to Kevin Foster-Bey. Agent Mangan was by all accounts the most involved and the most proactive of the two "co-agents in charge" of this investigation. He played a role in the marshalling virtually all of the government's primary evidence against Walter Bates. His lack of credibility during his sworn "proffer" testimony to the grand jury, his lack of credibility in securing search warrants, his dishonesty in misquoting witnesses, are all issues that will be raised by the defense at trial.   In addition, as to the case against Walter Bates, Agent Mangan was a witness to the sole photo identification procedure, conducted one year after the crime, at which the witness, a stranger, allegedly "positively" identified Walter Bates from photos by using the words, "It's the Jeep Liberty".

In light of the foregoing, it is significant and relevant (a) that Agent Mangan engaged in deliberate conduct designed to keep exculpatory reports out of the hands of the defendants, and (b) he testified falsely under oath about that conduct.

## C. Complicity by government attorneys:

As to this issue, Defendants maintain that the following facts were established variously at the hearing, through the parties' submissions, or are simply not in dispute.   First, that Agent Mangan was aware of the results of Morden's findings back in April,

---

1284, 1293-1294 (6th Cir 1997).   Similarly, both the Tenth and Fifth Circuits have observed that "[t]he quality or bias of a criminal investigation occasionally may affect the reliability of particular evidence in a trial, and hence, the facts surrounding the government's investigation may become relevant." United States v McVeigh, 153 F3d 1166, 1192 (10th Cir 1998), discussing Lowenfield v Phelps, 817 F2d 285, 291-92 (5th Cir 1987).

5

2004. (Id 37). Second, that Mangan told Mohsin of Morden's findings "that day", within "hours", "close in time" on or about April 7, 2004, because the results were "important". (Id 42). Third, that while Mangan told Mohsin, there is no indication from this record that either Mangan or Mohsin told AUSA Deegan. (Id 42). Consequently, unless the government sheds further light on this issue, the Court should assume that Mangan and Mohsin deliberately concealed their knowledge of the Morden findings from AUSA Deegan. Fourth, that the defense counsel received the results of the Morden findings, for the first time, from Lab personnel on July 8, 2004 -- the date on which the defense was poised, with experts appointed by Judge Tarnow, to conduct its own testing. Fifth, but-for the efforts of the defense (going around the government on three separate occasions to the Lab itself), this evidence may never have been discovered, because according to Agent Mangan, the reports never made their way to Agent Mangan via the mail and yet Mangan did nothing to retrieve a copy, and according to Sgt. Morden, it is the case agent's responsibility, not the Lab's, to do the follow-up on any outstanding reports. (Morden, Tr 1/27/05, pp 95-96).

Sixth, and perhaps most significantly, the record demonstrates that in its correspondence with the defense, in its pleadings, in its sworn affidavits, in its attempts at "striking" the evidentiary hearing, and even in its conduct during the sanctions hearing, the government obstructed the truth-finding process, deliberately and repeatedly concealing Agent Mangan's dishonesty regarding the reports, all of which compounds the misconduct. In other words,

6

not only were the reports themselves withheld, but worse, the government went to great lengths to hide Mangan's deceit regarding the reports.  The following facts support this finding:

(a)  the government moved to quash Walter Bates' Rule 17 subpoena served on the Michigan State Police Crime Lab seeking these precise reports (R 106); in negotiating a resolution to its motion to quash, the government assured defense counsel that it would retrieve the subpoenaed information and forward it to defense counsel; and thereafter, the exculpatory reports were omitted from the materials supplied to the defense;

(b) knowing of the results of the "fingerprint -in-glue" reports, the government sent AUSA Deegan to the July 8, 2004 meeting at the Lab; Mangan and AUSA Mohsin absented themselves and they deliberately left AUSA Deegan in the dark regarding the Morden findings; and it was not until a defense expert (a former MSP Lab supervisor) confronted the Lab experts directly that the reports were produced by the Lab experts;

(c) in its initial response to the motion for sanctions, the government failed to disclose that Agent Mangan and AUSA Mohsin knew of Morden's findings as early as April 7th (R 143);

(d) the government moved to strike the evidentiary hearing, citing its "offer" of affidavits as a substitute for a hearing (R 164);

(e) the government authored a series of affidavits (from Mangan, Mohsin, Deegan, etc.) which suggested falsely that the government did not know of the Morden findings until July 8, 2004 (R 164);

(f) the government insisted on conducting the direct examination of Mangan, and at no time during its direct examination was it revealed that Mangan and Mohsin knew of Morden's findings as far back as April, 2004.

(g)  neither AUSA Mohsin nor AUSA Deegan

7

intervened when Mangan gave false testimony,
during cross-examination, that he did not
learn of the results of Morden's testing until
July 8, 2004.

## D. The "lost" reports:

Defendant also challenges the government's further claim --
that it did not receive the actual report until July 8, 2004.
There are numerous facts which belie this claim. Sgt. Morden gave
an often meandering account regarding possible time lags which can
occur in the process of generating Lab reports.  However, when
speaking specifically about the relevant time lag between the date
of his "completion" of the report and the date the Lab mails the
report to the FBI, this time period would be "days" or "weeks".
(Morden, Tr 1/27/05, p 93).  [Note: Agent Mangan is apparently
still waiting for his copy of these reports to arrive in the mail].
Moreover, the Lab employee actually responsible for typing and then
transmitting and mailing such reports, Rebecca Prince, described
the ordinary and customary procedure for the transmittal of such
reports from the Lab to the FBI, and she estimated that time period
to be approximately two to three weeks. (Prince, Tr 1/27/05, 110-
111).  She considers her boss, Vern Zang, to be a responsible
person, and Zang performed both the peer and administrative reviews
on Morden's reports. (Id). Prince also testified that the physical
evidence itself would not be released by the Lab until the last of
the reports were sent out to the submitting agency, and the
physical evidence was picked up by the FBI in this case long before
the July 8, 2004 meeting. (Id 116-117; Defendant's Exhibit 1).
Prince did not offer any reason why the transmittal and mailing of

8

these particular reports to the responsible agency would be any different than the Lab's ordinary and customary practice.

It is well established in state and federal case law that upon a proper showing as to the normal business practice of mailing documents, a "presumption of delivery and receipt" of U.S. mail arises. Benner v Nationwide Mutual Insurance Company, 93 F3d 1228, 1234 (4th Cir 1996); Good v Detroit Automobile, 67 Mich App 270 (Mich App 1976). Based upon the foregoing testimony and authority, the Court should find that Agent Mangan received these documents in the mail.

A fact which also absolves the Lab for any lapse in transmitting the records -- it was the FBI, not the Lab, which changed its policy regarding the receipt, duplication, logging and maintenance of these types of reports.[2] Moreover, the exculpatory reports went missing almost immediately after the government's policy change. Agent Mangan explained in testimony and in his affidavit that the practice was changed "[p]rior to April of 2004". Under the "old" practice, if there were no "time crunch", Mangan made himself a copy of any scientific reports received from the Lab, he secured the Lab report in a "1-A" envelope, and he generated a cover letter documenting his receipt of the report. That practice was abolished in this case by Mangan and Mohsin. In this regard, the "handling of reports in this case [is] different

_____

[2] The Lab changed its policies with regard to the logging of the mailing date of such reports *after* this controversy arose. The Lab's policy change would not account for any missing reports. (Id 70-72).

9

than the handling of reports in other cases that [Mangan] has worked on." (Mangan, pp 54-55, 58). The blatantly suspicious timing of the Mangan-Mohsin policy change (i.e., contemporaneous with the lost, exculpatory reports) also supports a finding of intentional concealment and misconduct.

**E. Case law regarding concealment of exculpatory evidence:**

### 1. Identical, recent agent/AUSA misconduct in this district:

#### a) **United States** v **Koubriti**, 336 FSupp2d (ED Mich 2004)

The government's conduct in this case in the concealment of these admittedly exculpatory reports is eerily similar to that involved in the recent terrorism case of United States v Koubriti, 336 FSupp2d (ED Mich 2004). See Government's Response (confession of error) in Koubriti, appended. In Koubriti, the defendants claimed, and the government confessed to, a deliberate concealment of physical evidence exculpatory to the defendants. One of the central issues in that case was whether a sketch found in the defendants' apartment matched the appearance and layout of three locations in Jordan (including a hospital and an airport), because the government alleged that the sketch was part of a terrorist plot to attack at that location. Photographs taken of the hospital showed that the sketch was not consistent with the actual layout of these locations. The photographs were never turned over to the defendants, nor were the defendants ever told that the photographs existed. Koubriti, Govt's Response, pp 16-24.

As here, the government's witness skillfully, dishonestly and repeatedly dodged answering questions about the photographs. For

10

example, when defense counsel asked why no photographs were ever taken, rather than correct counsel's mistaken assumption, the witness testified that it was often difficult to gain clearance from foreign government for flyovers to take such photographs. Id 19, 22. As here, both the agent and one AUSA (Richard Convertino) were aware of the information being concealed. Id 25. Neither the Agent nor Convertino told the other AUSA (Keith Corbett) working on the case. Id 23, n 10. Further, as here, the agent and Convertino claimed that physical evidence in that case was housed in a room dedicated to that case, and the agent and Convertino claimed that a search of the room did not reveal the photographs. Id 24, n 12.

Significantly, in Koubriti, the government acknowledged a number of core principles well established in case law. First, the government's duty to disclose exculpatory evidence to the defense goes beyond physical evidence which is physically in the possession of the case agent or the assigned AUSA. Rather, the duty extends to such evidence within the "purview" of the government. Id 25. In Koubriti, the government agreed that evidence in the possession of State Department employee Ed Seitz was within the purview of the "government" in that case even if neither the agent nor the AUSA has possession. Second, the government's duties of discovery are not relieved when an agent or an AUSA deliberately fails to take physical possession of a report or other piece of evidence. Third, the government cannot avoid its obligation to disclose by simply failing to reduce information into written form. Id 47, n 30, citing United States v Brimage, 115 F3d 73, 76 78 (1st Cir 1997).

11

Koubriti is a case well known in this district, it involves the FBI and the United States Attorneys Office in this district, the revelations predated most of the government's conduct in this case, and it involves established facts, a confession of error, and a dismissal of the first terrorism indictment in this country by Judge Rosen despite a lengthy trial. United States v Koubriti, 336 FSupp2d 676 (ED Mich 2004). Rather than learn from the teachings of that case, Agent Mangan and AUSA Mohsin appear to have used the misconduct revealed in Koubriti as a blueprint for their conduct here.

### b) **Rugiero** v **United States**, 90-80941-01

In Rugiero, Magistrate Steven Pepe addressed discovery violations arising out of Mr. Rugiero's conflict of interest/ ineffective assistance of counsel claim in a proceeding under 28 USC §2255. Magistrate Pepe had ordered AUSA Keith Corbett to disclose a confidential Special Agent Report authored by FBI Special Agent Frank Scartozzi. When AUSA Corbett declared the report "missing", Magistrate Pepe ordered Agent Scartozzi effectively to reconstruct his report in lengthy deposition testimony. Both Magistrate Pepe and Judge Gadola took the government to task when, after "six years ... and twenty discovery hearings", the Scartozzi report suspiciously resurfaced. "The existence of those files were known to AUSA Corbett who regularly saw Agent Scartozzi and whose office was nearby on the same hall." Pepe Opinion at p 19, appended, affirmed by Judge Gadola in Rugiero, 330 FSupp2d 900 (ED Mich 2004).

12

**2) Rule 16, <u>Brady</u>, Due Process and Prosecutorial Misconduct**

As noted above, the Court has asked the parties to address whether there has been a Rule 16 violation. Defendants maintain that while Rule 16 is implicated, it is not a defendant's only protection against the government's wilful failure to disclose exculpatory evidence.

**(a) Rule 16:** Defendants maintain that they have established a Rule 16 violation for many reasons. First, the fingerprint reports were in the possession of the "prosecution team" because, under the unique circumstances revealed at the hearing, the "team" included Sgt. Charles Morden. In addition, under Rule 16, materials must be disclosed if they are in the government's "control". "Control" under Rule 16 has been defined as materials which the government knows about and has "access" to.

Morden explained that when the requests for comparisons were made, Mangan asked to be notified immediately of the results. (Morden, p 69). Morden complied by phoning Mangan with the results, even before the results were reviewed administratively by Lab and Unit Director Vern Zang. <u>Id</u> 69-71. Moreover, Morden was not notifying defense counsel in the same way. In fact, defense counsel was never advised that these tests had been ordered or that they were being performed at all. Morden and Mangan conferred as to whether other suspects should be tested. (<u>Id</u> 105).

Rule 16(a)(1)(C) provides, in pertinent part:

> Upon request of the defendant the government shall permit the defendant to inspect and copy ... *documents which are within the* possession, custody or *control of the*

13

> *government*, and which are material to the
> preparation of the defendant's defense ...

In determining the extent to which this rule applies to documents
in the possession of law enforcement personnel other than the
prosecutor, courts have looked to the extent to which the
government has "knowledge of" and "access" to the document, the
extent to which the government (i.e., the prosecutor and the
federal agent) have "control over" the material, the extent to
which the government and the other agency are working together,
the extent to which the other agency operates under the control of
the federal agent, and the extent to which the other agency is
"allied with the prosecution".   See United States v Volpe, 42
FSupp2d 204, 220-221 (ED NY 1999), discussing United States v
Bryan, 868 F2d 1032, 1035-36 (9th Cir 1989) (scope of Rule 16
obligation turns on "the extent to which prosecutor has knowledge
of and access to the documents sought by the defendant in each
case"), United States v Guerrerio, 680 FSupp 1215 (SDNY 1987) (no
Rule 16 obligation where AUSA had no "control" over the material);
United States v Robertson, 634 FSupp 1020, 1025 (ED Cal 1986)
(scope of term "government" for Rule 16 turns on prosecution's
access to the relevant evidence).[3]

Based upon the foregoing authority, and based upon the
italicized language from Rule 16 above, the fingerprint reports
were within the control of the government as of April 2004 because

---

[3] See also United States v Poindexter, 727 FSupp 1470, 1477 (D
DC 1989) (Rule 16 required production of documents in the
possession of a law enforcement unit "under the prosecutor's
control", or otherwise "allied with the prosecution").

14

despite the alleged lack of possession, both Agent Mangan and AUSA Mohsin had knowledge and access to the documents. At most, there would have been a short delay (a matter of days, not months) before a paper copy of the report would be available for retrieval. As to this issue, the Court need not find that the Lab is under the control of the FBI or the AUSA. Rather, Rule 16 focusses on the extent to which a particular document is under the government's control.

The government may argue that it did not have control or possession of the reports because Guy Nutter was asked to bring Lab materials to a meeting with the AUSA's in Detroit on May 13, 2004, and the defendants' fingerprint analyses were not in the packet of materials brought over by Nutter. Again, the government is playing games with the Court. Guy Nutter is a *microchemist* for the Lab. (Mangan, p 43). He had no responsibility for fingerprint comparisons. There is no evidence on this record that Nutter would even have been aware that Mangan had ordered additional fingerprint tests as to these defendants. The government did not call Mr. Nutter to testify at this hearing. Of the persons present at the meeting, only Mangan and Mohsin knew of the existence of the additional tests. They kept quiet, and, as usual, AUSA Deegan was left in the dark. Significantly, Mangan could not recall making mention of the outstanding fingerprint reports at the May 13, 2004 meeting. (Morden, p 45). There is nothing in this record from which this Court could find that Microchemist Nutter looked where he needed to look at the Lab to retrieve the fingerprints reports

15

because he would not have known they even existed.  Nutter is not
in Morden's unit at the Lab.  Mangan recalls that he did not
suggest to Deegan, Mohsin, or Nutter that a telephone call be
placed to fingerprint expert Morden at the Lab as to the
outstanding reports. (Id 45). This argument, if made by the
government in its responsive brief, is particularly disingenuous,
and only underscores the misconduct herein.[4]

Finally, to interpret Rule 16 as suggested by the government
herein emasculates the protections of Rule 16 and invites similar
misconduct.  If this Court decides that prosecutors can circumvent
Rule 16 by receiving verbal reports from the Michigan State Police,
avoiding the receipt of paper copies, and/or "losing" reports in
the mail, the defendant has lost the very protection that Rule 16
affords.

### (b) Brady, Due Process and Prosecutorial Misconduct:

Defendants maintain that the issue raised here is broader than
just Rule 16.  Rather, at issue here is -- (a) whether the
defendants Due Process rights are infringed when the government
circumvents its Rule 16 obligations by deliberately failing to take
possession of Rule 16 material, and (b) whether the there is
prosecutorial and FBI misconduct when the government acts in that
manner.  While the defendants agree that the Brady sanctions of new

---

[4] If the government truly wished to substantiate its "endless-
delay" theory regarding the fingerprint reports, the government
could have presented the testimony of Lab Director Vern Zang as a
witness.  They chose not to.  Consequently, there is nothing in the
instant record to suggest that these reports did not go out
consistent with the Lab's usual and ordinary practice.

trial and dismissal are not apt (yet) in this context, other aspects of Brady jurisprudence are instructive and ought to govern here. First, while Rule 16 case law analyzing this issue is sparse, for decades courts have been evaluating the scope of the "prosecution team", and the extent of the government's control over documents under Brady. There is no reason not to use this authority as a guide to the determination of the questions before the Court. As to these principle, many courts have held that the government's obligations under Brady extends beyond materials physically in its possession. In Kyles v Whitley, 514 US 419, 115 SCt 1555 (1995), the Court held that knowledge is imputed to the government where its agents knew or should have known of the existence of exculpatory material.

Courts have also ruled under Brady that scientific test results in the possession of police labs will be deemed in the "possession" of prosecutors even where prosecutor's are ignorant of the results. For example, in United States v Fairman, 769 F2d 386 (7th Cir 1985), the Court found a Brady violation where an exculpatory ballistics report, finding that a firearm was inoperable, was never provided to either the prosecution or the defense because of a police lab departmental policy dictating that only ballistic "matches" would be reported.

> The prosecutor's ignorance of the existence of Officer Smith's [ballistics] worksheet does not justify the State's failure to produce it, since Brady provides that the good faith or bad faith of the prosecution is irrelevant to the due process inquiry.... This may be especially true when the withheld evidence is under the control of a state instrumentality

17

> closely aligned with the prosecution, such as the police. See <u>Barbee</u> v <u>Warden, Maryland Penitentiary</u>, 331 F2d 842, 844, 846 (4th Cir 1964) (holding that nondisclosure of police ballistics and fingerprint tests violated defendant's due process rights even though there was no evidence that the prosecutor was aware that the reports existed) ....

> We believe that the purposes of <u>Brady</u> would not be served by allowing material exculpatory evidence to be withheld simply because the police, rather than the prosecutors, are responsible for the nondisclosure. See <u>Carey</u> v <u>Duckworth</u>, 738 F2d 875, 878 (7th Cir 1984) ("a prosecutor's office cannot get around <u>Brady</u> by keeping itself in ignorance, or [by] compartmentalizing information about different aspects of a case.")

This authority underscores that <u>Brady</u> and Rule 16 case law each are evaluating the same issues of "prosecution team", "control", etc. Moreover, if these authorities are applied to the instant case, it does not matter who fumbled the transfer of the fingerprint reports in this case from Sgt. Morden to Mangan to the AUSA to defense counsel. Because the agent had awareness and access to the report, the mere fact that the report was not disclosed timely should be deemed a violation of Rule 16.[5]

Moreover, to the extent that <u>Brady</u> discourages prosecutors from playing "shell games" with written reports so as to avoid disclosure, that principle should be applied here. As to this issue, the government's concessions in <u>Koubriti</u> regarding the information within the "purview" of the prosecution should be adopted here as well.

---

[5] While a Rule 16 or <u>Brady</u> violation may be established without a finding of bad faith, defendants contend that a bad faith violation warrants a stiffer sanction.

18

In addition, while <u>Brady</u> has ordinarily been interpreted to mandate only that disclosures be made in time for a defendant's effective use at trial, there are exceptions to this time line. For example, <u>Brady</u> material must be disclosed if that information is necessary for a defendant to litigate pretrial motions. <u>Grant</u> v <u>Aldredge</u>, 498 F2d 376, 382 (2d Cir 1974)(information necessary to litigate identification issues must be disclosed "well before the commencement of the trial ... when the defense [is] in a reasonable pre-trial position to evaluate carefully all the implications of that information."). See also <u>United States</u> v <u>Cobb</u>, 271 FSupp 159, 163 (SDNY 1967) ("[t]here may be instances where disclosures of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented.").   The Court in <u>United States</u> v <u>Apple</u>, 915 F2d 899 (4th Cir 1990), quoting from <u>Alderman</u> v <u>United States</u>, 394 US 165, 182-85 (1969), also addressed <u>Brady</u> requirements in the context of a pretrial suppression motion.

> "To compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, and then to withhold from him the means or tools to meet that burden, is to create an absurdity in the law."

<u>Apple</u>, 915 F2d at 910.

The defendants maintain that evidence concerning the government's concealment of the fingerprint-in-glue report was itself germane to the <u>Franks</u> hearing, and as such, the timing of

19

Brady was therefore accelerated.  The Franks hearing regarding the admissibility of glue evidence was slated for July 16, 2004.  It was Agent Mangan's allegedly false statements made in connection with his affidavit supporting the search warrant request that was at issue in the Franks hearing.  Had defense expert Sinke not intervened, Agent Mangan's omissions would have led to defense counsel's being ignorant of these glue reports up to and through the Franks hearing.  Consequently, Agent Mangan's nonchalant attitude regarding his obligation to retrieve the Morden report timely -- "I get [it] when I get it" (Id 42) -- appears less like sloth and more like intentional misconduct when the timing of the Franks hearing is considered.  Mangan would not have wanted to face questioning concerning his hiding of the reports at the Franks hearing.  For this reason as well, the Court should make a finding of intentional misconduct.

## E. The rationales for sanctions: deterrence of improper conduct, prejudice, and the preservation of judicial integrity

The defendants maintain that the question of sanctions does not turn exclusively upon a demonstration of prejudice.  Based upon considerations of fairness and justice, the federal courts may exercise their supervisory powers to provide relief, even without specific constitutional or statutory authorization.  United States v Hastings, 461 US 499; 103 SCt 1974, 1979; 70 LEd2d 96 (1983).  There are three rationales underlying the exercise of supervisory powers:  (1) to provide a remedy for violations of recognized rights, McNabb v United States 318 US 332, 340; 63 SCt 608; 87 LEd 819 (1943); Rea v United States, 350 US 214, 217; 76 SCt 292, 100

20

LEd 233 (1956); (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury, McNabb, 318 US at 345; Elkins v United States, 364 US 206, 222; 80 SCt 1437 (1960); and (3) to remedy and deter illegal conduct, United States v Payner, 447 US 727, 735-736, n 8; 100 SCt 2439, 65 LEd2d 468 (1980); Hastings, 103 SCt at 1979. In addition, Rule 16's sanction provision authorizes the Court to "enter any other order that is just under the circumstances".

In this case, the most powerful reason to afford sanctions is to deter this type of conduct in the future. Here, the agent in charge of the case ordered scientific tests from the Michigan State Police Crime Lab, he failed to reveal that the tests had even been ordered, he asked for verbal notification when results came in, he failed to disclose the results when learned, he intentionally avoided retrieving a paper copy of the report, and finally, he lied under oath about his knowledge of the test results and he lied under oath by claiming the reports were "lost" somewhere en route from the Lab to his desk. This is intolerable, particularly where the defense team does not have equal access. The involvement of AUSA Mohsin in this situation make it all the more egregious. If the Court permits such misconduct, the defense literally will have to redo every test, every analysis of each piece of key evidence, in a case alleging 13 separate bank robberies. Moreover, if defense counsel cannot rely on verbal statements made by AUSA's in criminal cases, every issue will need to be litigated in open court with the principle parties testifying under oath. The implications

21

of the government's conduct in this case reach well beyond this case. The fact that this conduct took place within a year of the Koubriti case, within a year of the government's concession of its own misconduct, dictates that sanctions are needed to deter misconduct.

There is prejudice here. Every attorney accepting assignments under the Criminal Justice Act can attest to the fact that CJA funding is scarce, and that the Sixth Circuit Court of Appeals has delayed funding requests coming out of this and other districts for extended periods of time. Despite the fact that this case has been pending since December of 2002, and despite requests for interim payment, neither defense counsel have been paid a penny on this case to date. Moreover, defense counsel received only a portion of the amount requested (and needed) for the payment of fingerprint and glue experts. The experts' fees have now exceeded the amount approved by Judge Tarnow, and the experts, like defense counsel, have not received any payment to date. Neither undersigned counsel nor the judiciary nor the public can afford such expensive shell games.

Because expert resources are limited, the defense has to pick and choose those situations in which valuable expert services are used. We have not reached trial in this case, and the defendants' glue and fingerprint expert witness fees are exhausted.[6]   The

---

[6] As to this issue, Agent Mangan showed an arrogant disregard for the costs of the tests he was ordering. He acknowledged during the hearing that he doesn't know or care about the cost of running each of these tests. "We don't get billed for them." (Id 38).

government wasted precious CJA funds by failing to disclose the results of scientific testing in violation of the clear mandates of Rule 16. The defendants cannot receive the effective assistance of counsel without the assistance of these experts. The Court need only look to what occurred on July 8, 2004 to assess the need for the defense experts. Two defense counsel -- diligent, reasonably intelligent, and with over 30 years of combined experience -- were unable to discern from the 60-plus pages of Lab reports (on glue alone) that more testing had been ordered on the fingerprint-in-glue stain. Defense counsel were unable to unearth these reports on their own, and this hearing demonstrated that Agent Mangan was not planning on disclosing the results on his own.

Consequently, the agents conduct in deliberately failing to retrieve these reports, his more brazen conduct, in lying to this Court under oath as to the precise question at issue in this sanctions hearing, and the AUSA's complicity in the misconduct, call for an exercise of the Court's supervisory powers.[7]

---

[7] In addition, as noted in prior briefs, this was not an isolated incident. The government withheld fingerprint test results regarding a comparison between Walter Bates' fingerprint impressions and latent prints found on the so-called "Dig" note. The "Dig" note is material in this case because Kevin Foster-Bey claims that this note was a threat by one of the defendants to dissuade him from testifying. According to the government, Walter Bates was a prime suspect for authoring the "Dig" note. Nevertheless, the report indicates that the fingerprints on the note were not those of Walter Bates. The government delayed disclosure of this exculpatory evidence for well over a year (from May 29, 2003 until August 13, 2004), disclosing it only after Walter Bates asked for the instant sanctions, on the eve of the originally scheduled trial date for this case.

Moreover, this would not be the first finding of bad faith by the government in this case. Magistrate Judge Virginia Morgan

23

**F. Request for findings, sanctions and further remedy:**

Based upon all of the foregoing, defendants request that this Court make the following findings:

> (a) that Agent Mangan offered knowingly false testimony as to when he learned of the results of the Morden fingerprint testing;
>
> (b) that Agent Mangan and AUSA Mohsin engaged in a deliberate violation of Rule 16;
>
> (c) that the government's collective actions surrounding these issues demonstrate bad faith;
>
> (d) that the government's actions in failing to disclose exculpatory information is consistent with a pattern of such misconduct by Assistant U.S. Attorneys in this district.

In addition, whether viewed as a sanction or simply as a question of trial relevance and the admissibility of evidence, the Court should allow greater latitude at trial in the cross-examination of Agent Mangan in light of his conduct herein. "[W]hen the government undertakes a prosecution in which it relies primarily on the evidence of a witness who is vulnerable to claims of bias, interest or lack of credibility, the prosecution rather

---

found that AUSA Mohsin was not acting in good faith (a) by waiting until the afternoon before the lengthy Thanksgiving weekend holiday break to arraign the defendant, (b) by seeking immediate detention, (c) and by seeking an adjournment of the detention hearing because she was not prepared to proceed -- all as to a criminal investigation that had been ongoing for over a year. (Detention hearing, Tr 11/26/03, pp 11), excerpts appended.

Mohsin acted in bad faith yet again when, following the long Thanksgiving weekend break, she stated to Judge Tarnow on the record that Magistrate Morgan did not find that Mohsin was acting in bad faith given her actions at the detention hearing. (Excerpt of Bond Review Hearing, Tr 12/3/03), excerpt appended.

24

than the defendant must bear the onus of this circumstance." <u>United States</u> v <u>Garrett</u>, 542 F2d 23 (6th Cir 1976).

In addition, the defense should be entitled to a reasonably tailored jury instruction in which the jury is advised in some manner that the government engaged in intentional misconduct by failing to disclose the exculpatory fingerprint test results.

In addition, in light of the fact that the government's conduct contributed to the exhaustion of the fees approved by Judge Tarnow for the defendants' glue and fingerprint experts, additional funds should be authorized following an updated demonstration of need by defense counsel.

Finally, defendants defer to the Court to recommend whatever other, additional sanctions the Court deems appropriate.

Respectfully submitted,

*Joan Margan/ams*
JOAN ELLERBUSCH MORGAN
2057 Orchard Lake Road
Sylvan Lake, MI   48320
(248) 335-9157

*Carole M. Stanyar*
CAROLE M. STANYAR P34830
3060 Penobscot Building
645 Griswold Avenue
Detroit, MI   48226   48320
(313) 963-7222

Attorneys for Defendants Albert and Walter Bates

Dated: March 10, 2005

25

## ATTACHMENTS TO POST-HEARING BRIEF

United States v Koubriti, Cr No 01-80778, Government's Consolidated Response Concurring in the Defendants' Motions for New Trial, August 31, 2004

Rugiero v United States, Cr No 90-80941, Report and Recommendation, Honorable Steven D. Pepe, April 30, 2004

United States v Walter Bates, Cr No 02-80948, Detention Hearing, Tr 11/26/03, Honorable Virginia Morgan, pp 1, 3-11.

United States v Walter Bates, Cr No 02-80948, Excerpt of Bond Review Hearing, Judge Tarnow, December 3, 2003.

<u>United States</u> v <u>Koubriti</u>, Cr No 01-80778,
Government's Consolidated Response Concurring
in the Defendants' Motions for New Trial,
August 31, 2004

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

CRIMINAL NO. 01-80778

v.

HON: GERALD E. ROSEN

D-1 KARIM KOUBRITI,
D-2 AHMED HANNAN, and
D-4 ABDEL ILAH EL MARDOUDI,
Defendants.

_____/

## GOVERNMENT'S CONSOLIDATED RESPONSE CONCURRING IN THE DEFENDANTS' MOTIONS FOR A NEW TRIAL and GOVERNMENT'S MOTION TO DISMISS COUNT ONE WITHOUT PREJUDICE AND MEMORANDUM OF LAW IN SUPPORT THEREOF

The United States, through undersigned counsel, hereby submits its consolidated response to the defendants' motions for a new trial. For the reasons discussed below, the government agrees that a new trial is appropriate and further requests that the Court dismiss without prejudice Count I of the Third Superseding Indictment.

## I. INTRODUCTION

On June 3, 2003, the jury found defendants Koubriti and El Mardoudi guilty of Counts I and II of the Third Superseding Indictment, but acquitted them of Counts III and IV; Hannan was convicted of Count II (document fraud conspiracy) but acquitted of

Brady or Giglio material." Characterizing the post-trial proceedings as "a fine kettle of fish" and "the most unpleasant task that I've had in almost 14 years as a judge," the court indicated that it would not rule on the new trial motions until this review was complete. Id. at 165.

On June 29, 2004, upon completion of the file review and this Court's ruling on several redaction/relevance issues, an organized disclosure of potentially exculpatory/impeaching unclassified documents was made to the Court, defense counsel, and the original trial prosecution team. That order also required the government to provide to the defense on or before August 1, 2004 (later extended to August 30, 2004), copies of any witness interview memoranda (FBI FD-302s in a redacted form). These memoranda would include post-trial FBI interviews conducted and supervised by the Public Integrity Section of the U.S. Department of Justice, Criminal Division. The Court shortly thereafter established an expedited briefing schedule and set evidentiary hearings for late summer/early fall.

Having conducted the thorough review of the record ordered by the Court, searched all known investigative files for undisclosed Brady/Giglio materials, and reviewed interview memoranda prepared by the Public Integrity Section, the government has concluded that (1) the prosecution failed to disclose matters which, viewed collectively, were "material" to the defense, see Kyles v. Whitley, 514 U.S. 419, 437 (1995) (evidence suppressed by prosecution must be "considered collectively, not item by item"); (2) the prosecution allowed an incomplete and, at times, misleading record to be

-3-

presented regarding several important issues; (3) Additional hearings will lead the Court

to grant the new trial request; and (4) the defendants deserve to have a speedy re-trial of

any remaining viable counts without enduring months of additional delay such hearings

will necessarily require.

To date, the defendants' post-trial motions have resulted in a single day-long

hearing in which government attorneys presented conflicting testimony about why

significant impeachment material was not disclosed. That brief hearing gave just a

glimpse of the conflicting testimony that would be presented at any future hearing

regarding the additional non-disclosures uncovered during the Court-ordered file review.

At such a hearing, government agents, attorneys and other employees would disagree

about whether the prosecution knew of significant undisclosed materials, purposefully

withheld them, and/or intentionally presented false and misleading testimony, but all

would agree that materials were not disclosed. As more fully explained below, issues

regarding knowledge and key materials like the Turkish National Police, Intelligence

Division (TNP) opinion, the Air Force Middle East Map theory and the Jordan photos

would have been found with minimal diligence.

As part of their fact finding mission, undersigned counsel provided to lead

prosecutor Richard Convertino and co-counsel Keith Corbett copies of all documents

uncovered during the Court-ordered file review and requested their position regarding

prior disclosure (if any), materiality, and impact on the government's response to

defendants' new trial motion. AUSA Convertino, through a hypothetical proffer through

-4-

--

his attorney, provided information that is at odds with other documentary evidence and testimony. Keith Corbett, his supervisor and co-counsel, informed us that he would not have participated in the case had he known of the existence of certain materials discovered in the Court-ordered file review. He also indicated that, in his view, the cumulative weight of the problems uncovered since the verdicts warranted the government's acquiescence in the granting of a new trial.[2]

As fully explained in the detailed memorandum of law, the government has concluded that there is no reasonable possibility that it could endure further hearings and emerge with the convictions intact. In its best light, the record would show that the prosecution committed a pattern of mistakes and oversights that deprived the defendants of discoverable evidence (including impeachment material) and created a record filled with misleading inferences that such material did not exist. Accordingly, the government believes that it should not prolong the resolution of this matter pursuing hearings it has no reasonable prospect of winning.

Koubriti, who was convicted of Counts 1 and 2, is currently being held without bond; Hannan, who was convicted of Count 2 only, has been released to a half-way house with electronic monitoring. Koubriti has filed a motion seeking bond. The government is filing a response to the motion seeking bond, recommending a restrictive form of release for defendant Koubriti similar to that of Hannan.

---

[2]     This response does not address additional disclosure issues involving classified materials which can not be discussed in these pleadings.

-5-

—

## II. BACKGROUND

The Koubriti case (otherwise known as the "Detroit Sleeper Cell case") was the

first case to proceed to trial on terrorism-related charges following the September 11th

terrorist attacks. The case arose from a September 17, 2001 search of an apartment in the

greater Detroit area. Detroit Joint Terrorism Task Force ("JTTF") agents went to the

apartment in an attempt to locate and question Nabil Al-Marabh, an individual on the

FBI's "watch list" of suspected terrorists. Although Al-Marabh's name was listed on the

mailbox, he was not actually living at the apartment at the time of the search. Instead

agents found defendants Karim Koubriti, Ahmed Hannan and Farouk Ali-Haimoud, who

were living as apparent transients with little or no furniture. The defendants were found

in possession of false identity documents, over 100 audio tapes featuring fundamentalist

Islamic teachings, a videotape depicting a number of American tourist landmarks, and a

day planner bearing suspicious drawings labeled "The American Air Base in Turkey

under the Leadership of Defense Minister," and "Queen Alia, Jordan." Nonetheless, none

of the defendants acknowledged engaging in terrorist activity; there was no direct

evidence tying the defendants to any known Terrorist group; and, until Hmimssa began

cooperating with the prosecution, no witness could testify that defendants had committed

or were intending to commit any terrorist acts.

Koubriti, Hannan and Ali-Haimoud were originally charged in a September 18,

2001 complaint with possession of a false identification and/or immigration document, in

violation of 18 U.S.C. §§ 1028(a)(4), 1546, and 371. The case was assigned to Assistant

-6-

United States Attorney Richard Convertino. The charges were amended several times. Most significantly, after a former roommate Youseff Hmimssa agreed to cooperate, the original three defendants were charged along with a fourth man (Abdel Ilah El Mardoudi) with conspiring to provide material support or resources to terrorists. The case proceeded to trial on a Third Superseding Indictment charging conspiracy to provide material support or resources to terrorism in violation of 18 U.S.C. §§ 371 and 2339A (Count I); conspiracy to engage in fraud and misuse of visas, permits and other documents, in violation of 18 U.S. C. § 1546(a)(b) and § 371 (Count II); fraud and misuse of visas, permits and other documents, in violation of 18 U.S.C. § 1546(a) and § 2 (Count III); and fraud and related activity in connection with identification documents and information, in violation of § 1028(a)(6) and § 2 (Count IV).

The detailed explanations contained within this memorandum are provided to establish the basis of the government's decision to agree to defendants' request for a new trial and to seek to dismiss Count I. Due to the nature of this case, a thorough and detailed exposition of the facts is necessary to ensure that the government's position and reasoning is accurately understood.

### III. STANDARD OF REVIEW UNDER RULE 33

Defendants rest their new trial motions, in part, on a claim that the government failed to disclose exculpatory evidence, in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). In Strickler v. Greene, 527 U.S. 263, 281-82 (1999), the Supreme Court explained the three-part test a defendant must meet: "There are three components of a true

-7-

Brady violation: The evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

The Brady rule requires the government to disclose evidence:

in its possession that is *both* favorable to the accused and material to guilt or punishment. * * * [A] majority of this Court has agreed, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

Presser, 844 F.2d 1275, 1281 (6th Cir. 1988) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 57 (1987)). Even if the Government withholds Brady material, defendant has a constitutional remedy "*only* if [he] can show that there is a reasonable probability that the 'omission deprived the defendant of a fair trial.'" Id., quoting Agurs, 427 U.S. at 108. For purposes of determining whether defendants are entitled to the reversal of their convictions and a new trial for Brady violations, however, a Court need not resolve underlying questions of wilfulness or inadvertence. Rather, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution.*" Brady v. Maryland, 373 U.S. 83, 87 (1963) (emphasis added).

The term "material" applies to evidence that is admissible or would lead *directly* to admissible evidence. United States v. Phillip, 948 F.2d 241, 250 (6th Cir. 1991)

-8-

(emphasis added). Thus, under Brady, information is not "material" and therefore, disclosable, if it is only possible that it could lead to exculpatory evidence. Cf. Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995) (disclosure of inadmissible polygraph results not required based on "mere speculation" that it might have led to additional admissible evidence).

In addition, impeachment information that is merely cumulative does not create a "reasonable probability" of a different result at trial. As the Sixth Circuit held in Byrd v. Collins, 209 F.3d 486 (6th Cir. 2000):

> [W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.

Id. at 518 (quoting United States v. Avellino, 136 F.3d 249, 257 (2nd Cir. 1998)).

Defendants must show not just a possibility, but a probability of a different result. Strickler v. Greene, 527 U.S. 263, 291 (1999). In determining materiality, evidence suppressed by the prosecution must be "considered collectively, not item by item." Kyles v. Whitley, 514 U.S. at 419, 435 (1995). The question is whether defendants have met their burden of proving that this cumulative undisclosed evidence can "reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." Strickler, 527 U.S. at 290 (emphasis added) (quoting Kyles, 514 U.S. at 419, 435).

-9-

## IV. THEORY OF PROSECUTION

Count I (the material support charge) was premised on the theory that the defendants constituted the Detroit-based "cell" of an Islamic terrorist organization. See Third Superseding Indictment at 1-2. Although the indictment appears to allege that this organization was Al-Qaeda, the government did not attempt to prove this fact at trial.[3] Instead, it argued that the defendants were Islamic Salafists (i.e., Salafiyya followers) who sought to assist some unspecified international terrorist organization.

In the absence of evidence that the defendants actually committed terrorist acts or were tied to any specific terrorist organization, the government sought to establish that the defendants were a "shadowy group" that "stayed in the weeds, * * * planning, seeking direction, awaiting the call." 8 Tr. 1023-24 (Opening Statement). See also Third Superseding Indictment at 8 (defendants "operated as a covert underground support unit for terrorist attacks within and outside the United States, as well as a 'sleeper' operational combat cell").

---

[3]     The Third Superseding Indictment alleged that defendants aimed to assist "a loose transnational network of radical Islamists," who were influenced by the Salafiyya religious movement. Id. at 2-3. It also described Al Takfir Wal Hijira as a "radical and extremist" global jihadist faction that trained "cells" to blend into Western societies in order to plot terrorist attacks. Id. at 4. Finally, it alleged that "[t]he Salafist and Takfiris are one arm of the greater global Jihadist organization known as 'Al-Qaeda.'" Id. at 7. While there were occasional references to Al Qaeda at trial, the government did not present any evidence tying the defendants to any individual identified with Al Qaeda. Other than testimony that the defendants were found living in an apartment once lived in by Al Marabh, the government did not present evidence actually tying the defendants to Al Marabh.

The government's theory of the case was explained most clearly by FBI Supervisory Special Agent (SSA) Paul George, the Supervisor of the Detroit JTTF, who testified at trial as a summary expert. George opined that the defendants constituted an operational or potential operational cell that was "going to strike out against targets, against the United States and abroad." 25 Tr. 4635. George based these conclusions on (1) his opinion that the drawings and videotape seized from the defendants constituted operational terrorist "casing material"; (2) the testimony of Hmimssa; and (3) the defendants' acquisition of fraudulent identity documents and their involvement in other fraudulent activities (which he characterized as "economic Jihad"). Id. at 4635.

George made clear that the sketches and videotape factored heavily into his opinion. He explained that the defendants' possession of this casing material "clearly show[s] this is a repository of intelligence" containing "operational terrorist material." Id. He further explained that his examination of the casing material showed him that "this is an intelligence group, an intelligence cell whose purpose is to maintain potential targets, to maintain intelligence casing material." Id. at 4630. He testified that the wide variety of fraudulent documents was consistent with the testimony [of Hmimssa] that this cell "had the purpose of bringing in other members." Id. He further testified that the defendants' attempts to obtain commercial driver's licenses were consistent with the transportation needs of a terrorist cell and that attempts to get hazardous material specifications were consistent with a list of things a terror cell seeks to establish. Id. at 4631. He testified that international wire transfers (like those evidenced in this case) are

-11-

"the hallmark of an international terrorist organization." Id. at 4632. Finally, he testified that defendant El Mardoudi's "ability" (through credit card fraud schemes) "to connect two people who can communicate freely on the telephone or in code as it is called for by in some of the [terrorist] manuals is remarkable. Um, it exceeds any—any trade craft that I've seen as the ability of simply being untraceable, so I said that fulfills that communication, so it is my opinion that this is a terrorist support cell." Id.[4]

In short, the government's theory that the defendants were an "intelligence collection cell" and an "operational or potentially an operational cell" largely depended on three different types of evidence: (1) expert testimony that the day planner sketches and the videotape constituted "operational terrorist casing material," (2) the testimony of Hmimssa that the defendants had terrorist leanings and intentions, and (3) corroborating evidence that the defendants did things that were consistent with terrorist activities (but also consistent with ordinary criminal, commercial or religious activities). The

---

[4] In addition to testifying that the defendants constituted a terrorist cell, SSA George opined about the roles each played within the cell. 25 Tr. 4521. He testified that Koubriti had a leadership role based on Koubriti's "language abilities" and "leadership personality." Id. at 4516-17. He further testified that Hmimssa's testimony that Koubriti told him he would slit his throat and brand across his hand if he were an informant, is further indicia of leadership because "Leaders will react more impulsively. This, again, is why they are leaders because they are willing to take change [sic] because they are willing to express themselves more often and more aggressively then would be a member." Id. at 4518. He testified that El Mardoudi had a leadership role based on his ability to communicate internationally without leaving traces through his misappropriation of other people's credit cards, the fact that he received wire transfers, his knowledge of language and his level of education (a law degree). He testified he would put Hannan and Ali-Haimoud "as simply involved group members." Id. at 4516. As to Ali-Haimoud, he testified "I find him as a new member who is responsible or at least taken the role of a clarity of doctrine, a clarity of idea," which he explained was a very important aspect of recruitment. Id. at 4520.

-12-

corroborating activities included document fraud, credit card fraud, attempting to obtain commercial truck licenses with hazardous material specifications, the possession of audio tapes of Salafist speakers, and the use of international wire transfers.

Unfortunately, numerous developments since trial, including the discovery of significant materials not disclosed by the prosecution, have undermined each part of this three-legged stool. The remainder of this memorandum discusses some of these developments, and their impact on the case. We recognize that this memorandum does not address all of the claims defendants have raised (or could be expected to raise) in support of their motions. Nonetheless, we believe that the issues discussed herein illustrate the problems that have motivated the government's decision to acquiesce in the new trial motions and to dismiss Count I without prejudice.[5]

---

[5]        During trial, the Court repeatedly instructed the government to provide necessary discovery in a timely fashion. See, e.g., 9 Tr. 1474 ("I've asked you to provide them with the names of witnesses [that you are going to call the next day]. Don't hold it close to your vest, err on the side of caution and provide them with more rather than less."). In addition, the Court made clear that it would decide for itself whether materials in the government's possession were discoverable. When AUSA Corbett suggested that the government usually decides whether FBI interview memoranda contained Brady or Giglio material, the Court responded "Not in this Court." Id. at 1505. The Court then explained that virtually every Court in the District required the government to turn over 302s in advance unless there was a good reason not to. Id. at 1504-09. During the course of the discussion, AUSA Convertino acknowledged that the defense did not want the government to have the gate-keeper function and assured the Court "If I have a question, I always refer it to the Court to make the ultimate determination as to whether or not it constitutes discoverable impeachment material." Id. at 1508. AUSA Corbett concluded the discussion by acknowledging that he understood what the Court was saying: "Any 302 of any witness we call will be presented to the defendants, or in the event it is not, it will be presented to the Court to make the determination in order not to be turned over." Id. at 1512. Likewise, the Court followed the same procedure regarding other potential Giglio material, including AUSA Convertino's notes of his Hmimssa debriefings. 14 Tr. 2524-38.

A. Three-Legged Stool

1.    Casing Materials

It was essential to the government's theory to establish that the day planner

drawings and videotape seized from defendants' apartment were terrorist casing material.

SSA George testified that casing, which he defined as the evaluation of an area for

operational use, is always used in preparation for a terror attack. 25 Tr. 4529. He

explained that for terrorist organizations, security is more important than details

accumulated at the site because the people at the casing site can not know they are being

cased. Id. at 4530-32.

a.    The Day Planner Sketches

In the absence of any direct testimony concerning the creation, purpose and

intended use of the day planner sketches, the government offered the expert testimony of

SSA George to establish that the drawings with Arabic words "American Airbase in

Turkey under the Leadership of Defense Minister" and "Queen Alia Jordan" were casing

sketches. Id. at 4538 and 4540. George testified that these drawings were consistent with

casing sketches he had drawn in foreign countries and that, although the drawings might

look crude, it is imperative to keep things simple because any unnecessary marks confuse

the mind with too much detail. Id. at 4539. In George's opinion, the day planner

drawings were examples of a situation where minimal details are recorded on an as-

needed basis because everything the operator does is in preparation for the possibility of

arrest. Id. at 4535.

-14-

SSA George explained that he evaluated the drawings and reached his opinions using a three step formula: First, he looks at the drawing to determine whether it could be a casing sketch – "Fundamentally, you're just looking at, does this depict something that could exist * * * that this may be something that could be casing." Next he questions whether the "casing sketch is consistent with a place in the real world"– a question he described as fundamental. The final question is whether or not the sketched location "is a possible [terrorist] target." Id. at 4539. He explained that he reached his opinion that the Turkey and Jordan drawings were operational terrorist casing sketches based entirely on this formula without reference to any other evidence. 26 Tr. 4697.

Applying this formula, SSA George testified that these drawings were operational terrorist casing sketches based on his opinion that "the drawing looked like it depicted something that could exist" (i.e., "something that could be casing") and the opinions of others that the sketches were in fact "consistent with a place in the real world" and were "possible targets." 25 Tr. 4538-39.[6]

       (i)    Queen Alia, Jordan Sketches

---

[6]     Additional factors relied upon by the Turkish National Police, Intelligence Division (TNP) and the CIA (infra at 33-35), as to whether a sketch matched the style of other known terrorist casing sketches, and the CIA's apparent emphasis on the quality or training level of the sketch artist, point out the vulnerability of SSA George's analysis in any retrial of Count 1. We note that straight application of SSA George's formula without considering any evidence regarding the origin and intended use of the underlying material could, under certain circumstances, be misleading. For example, under this formula, any drawing of the World Trade Center towers prior to 9-11 or any video of various Las Vegas hotels could be described as operational casing material even though the drawing might have been made by a school child and the video might have been purchased by a tourist from a hotel gift shop.

-15-

SSA George testified that GX 2A-6 (one of the Queen Alia drawings) was, in his opinion, a casing sketch because "it has all the markings one would need and has a location." Id. at 4540. In reaching this opinion, SSA George relied on the prior testimony of FBI SA Michael Thomas and Ray Smith, an employee of the US State Department assigned to the US Embassy in Amman, Jordan.

Special Agent Thomas, the government's first witness, testified that he traveled to Amman, Jordan in approximately December 2001 with the Queen Alia sketch (GX 2A-6) and showed it to members of the Jordanian Intelligence Service and a member of the US State Department (later identified as Ray Smith, 11 Tr. 1770-71). He further testified that the Jordanian intelligence officers said there were three locations in Jordan that have Queen Alia in their name – The Queen Alia Airport, the Queen Alia Hotel and the Queen Alia Military Hospital. He testified that he and the Jordanians visited all three sites with the sketch and that they believed the site in the sketch was the Queen Alia Military Hospital. 8 Tr. 1131-35.

Thomas described the route he traveled to reach the hospital and showed the jury how it corresponded with the sketch. He then identified an object on the drawing as "a very large dead tree" and testified that from what he observed, the drawing was a representation of what he saw on the ground at the Queen Alia Military Hospital. Id. at 1131-34. At the request of the Court, he re-described in step-by-step detail exactly what they did and saw, testified that there was a large, dead tree with no leaves, only branches,

and also identified a "very sharp turn" that was "exactly consistent" with the way it was drawn on the sketch. Id. at 1138.

The government did not use any photos of the Queen Alia Hospital to reinforce Thomas' testimony that the site matched the sketch. On cross-examination, Thomas was asked whether he had brought a camera with him to Jordan and whether he took any pictures of either the hospital or the dead tree. Thomas said he did bring a camera to Jordan, but unfortunately did not take any pictures of the hospital or the dead tree. He said that he did direct another individual who was with them (apparently Smith) to "take those photographs or ask that the photographs be taken," but that he (Thomas) did not take any himself. The cross-examiner did not ask Thomas whether the other person actually took any photos and Thomas did not indicate whether he had received any. Id. at 1179-80. Instead, the defense later questioned Smith about this. Infra at 19.

The following trial day, the Court inquired about upcoming witnesses and AUSA Convertino indicated that the government intended to call Ray Smith, who would testify, like SA Thomas, that the sketch and the Queen Alia Hospital track one another. The defense inquired whether Smith intended to introduce any photographs and AUSA Convertino answered "No, I don't think so." 9 Tr. 1497-98. The government did not advise the Court that it had obtained photographs.

The next day, Smith testified that he had traveled with Thomas and two Jordanian agents to the Queen Alia Airport, the Queen Alia Hotel (which is next to the airport) and the Queen Alia Military Hospital in or about late February/early March 2002 to see if the

-17-

sketch matched any of the three locations.[7] 11 Tr. 1770-87. Even before they arrived at
the airport/hotel area, Smith was convinced that neither would match the sketch, having
been there on previous occasions. Upon arrival they quickly concluded that those
locations did not match the sketch. 11 Tr. 1773.

After viewing the airport/hotel area, they went to the Queen Alia Hospital because
"the GID thought this might be a location worth checking." Referring to GX2A-6 as a
map, Smith illustrated the routes they took to the hospital, addressed some landmarks he
believed corresponded to the sketch, and then began to discuss a "prominent" dead tree
standing by the side of the road. Smith testified that the tree was "another point that
matched this sketch to me, started making me think more that this is related to the Queen
Alia Military Hospital." Id. at 1778. Smith further testified that after they drove to the
tree, they stopped, looked at the dead tree, and looked at a cross road that was also very
similar to the drawing. He also testified that there was a particular road with a "hitch
back coming down and leading to" a neighborhood, which made it seem "like every time
we turned, it was getting more and more like this drawing." Id. at 1780. He further
testified that based on his experience "as a security officer, if I were to see this sketch and
I worked at that hospital, I'd be very concerned" that "this was part of some bigger plan."
Id. at 1783-84. He further testified that the sketch had sufficient detail to be a casing

---

[7]     Neither Smith nor Thomas mentioned that AUSA Convertino had also traveled to
Jordan and accompanied them on the site visits. See 8 Tr. 1132 (Thomas) and 11 Tr. 1771
(Smith).

-18-

sketch and that GX 2A-5 is, in his mind, just a smaller drawing of what he saw in the other sketch. Id. He also reiterated that the most prominent thing to him was "the tree and the hospital here, marked with an X." Id. at 1784. AUSA Convertino next asked Smith whether he had an opportunity to do an overhead flight of this location, and, if so how that vantage point affected his opinion. Smith testified that he did a security fly-over of the hospital when the Vice President visited Amman. He said from the fly over vantage point, the road was again prominent, but

> *[T]he thing that kept sticking out in my mind was this tree. I could see that at a 300 foot level. * * * No doubt in my mind I had sufficient information to believe that this sketch was similar to the Queen Alia Military Hospital, by just doing the on-the-ground work. But doing the fly over reinforced that a great deal.* Id. at 1787.

AUSA Convertino also asked if Smith took any photographs of the site. Smith responded that "[D]iplomats serving overseas * * * never take picture of a military installation, quasi military installation or security people. * * * It could cause bigger political implications. * * * I would have to get higher approval as high as the Ambassador * * * who would have to pass it off to the Government of Jordan." Id. at 1785-86.

On cross-examination, Smith reiterated in even stronger terms that he did not believe he could have obtained photographs. He also conceded that it would not be wise for someone to pick a dead tree as a landmark because a dead tree could easily be removed. Id. at 1797-1811. Neither Smith nor AUSA Convertino gave any indication to

-19-

the Court that there was a strong likelihood that the tree had, in fact, already been

removed or that the prosecution had, in fact, obtained photos.

Based on the testimony of Thomas and Smith, George testified that in his opinion

the "Queen Alia Jordan" drawing was a casing sketch because:

> *It has a clearly defined set of markings that would show on that. And most significant to me as evaluating this is casing, is actually the tree. * * * That is an important element, is that it tells me when I get there, I'm in the right place. And again, you put yourself in the shoes of the operator. There is a great deal of tension, a great deal of adrenaline and you need certainty. That mark there is that certainty. * * * If I were the person who needed to go there and know I was in the right place, a tree does better then does North, South, any other thing, any other description. Id. at 4540-41.*

### Undisclosed Evidence Regarding the Jordan Sketches

Our Court-ordered file review raises serious concerns regarding the above

testimony. On August 11, 2004, we received a series of e-mails from the State

Department. The e-mails were requested after Ed Seitz, a State Department employee

assigned to the Detroit JTTF, advised that, at AUSA Convertino's request, he had

obtained and given to SA Thomas a series of aerial and ground photos of the Queen Alia

Hospital. The e-mails raise the prospect that, contrary to the testimony of Thomas and

Smith, (1) there was no initial consensus that the drawings represented the hospital and

(2) photos could have been and were in fact obtained upon request.

Some important features of these e-mails are as follows:

- A September 3, 2002 @ 8:59 am e-mail from Matthew Rhind to Ed Seitz
  indicates that Ray Smith (the government trial witness who positively

-20-

matched the sketch to the Queen Alia Hospital) had advised Rhind that he, the "LegAtt," an FBI agent from Detroit and an AUSA went to visit the Queen Alia Hospital and Airport and, based on the sketch, they could not establish which site (if either) the sketch referred to.[8]

- In a series of subsequent e-mails, Seitz asked Rhind for photos (including aerials) of the hospital, road networks leading to the hospital, and the large dead tree located near the entrance of the rear parking lot. Within a week, Seitz received a return e-mail from Kevin O'Connor containing aerial photos of Queen Alia Military Hospital. O'Connor indicated that they were unable to locate the "large dead tree" which might have been removed during recent renovations.

- Seitz then again requested photos of the dead tree, noting that "the AUSA is on my neck." O'Connor responded by suggesting again that the dead tree might have been removed, but enclosing additional photos of the area where it was supposed to be located. Two weeks later, Seitz tried again, giving O'Connor further direction about where the tree might be located. O'Connor responded by asking for a drawing.

---

[8]     It is unknown how reliable or accurate Rhind's recollection is of what Smith told him. We note however, that a draft prosecution memorandum dated 04/02, which is after the Jordan trip, still refers to the casing sketch as that of the Queen Alia Airport, not the Hospital.

- Several months later, in February 2003, Seitz forwarded the e-mail
  containing the second set of pictures to paralegal Ana Bruni with a copy to
  Convertino. Bruni responded by saying that they needed the earlier e-mail,
  which had more pictures. Seitz then forwarded that e-mail to Bruni with a
  copy to AUSA Convertino. Convertino sent a reply e-mail: "Thanks Ed!!
  We love ya."[9]

Neither the photos nor the e-mails were disclosed to the defense or the Court for
consideration under the Court's Brady/Giglio procedures. Instead, misleading testimony
was elicited that created the false impression that there was initial consensus that the
drawing depicted the Queen Alia Hospital and that photos could not be taken due to
diplomatic red tape. In addition to the testimony of Thomas and Smith, summarized
above, George testified as follows during his cross-examination:

> Q   You heard the testimony of Harry Raymond Smith, the foreman [sic]
>     policeman from South Carolina that works for the Department of State?
>
> A   Yes, sir.
>
> Q   You agree with him that the situation didn't warrant going through the
>     whatever steps are necessary to take some photos?

---

[9]   O'Connor indicated in a recent interview that he believed that Smith had
previously attempted to take aerial photographs of the hospital but had some type of incident
with the helicopter door coming open while the photographs were being taken. Although
O'Connor was not involved in that first attempt, he said he and the Jordanian police were
concerned about avoiding a repeat of that mishap. He further stated that he had no problem
obtaining permission to take the aerial photographs and reiterated that it was the Jordanians who
took him in the helicopter when they took the photographs. Kevin O'Connor 302.

—

> *A*   *My understanding of his responsibility at that embassy, sir, is, first, to protect the people inside that embassy. If at any time he feels any request he would make or any action he would make, would lesson the security of the Americans assigned to his embassy, sir, I leave that discretion entirely to him. So if he tells me he felt that taking photographs would, in any way, impact on his ability to do his primary mission, sir, I leave that entirely to him. 26 Tr. 4662.*

SSA George further testified "In fact the testimony [referring to Smith] specifically said

that photographs could not be taken." Id. at 4843.[10]

The government had a duty to clarify the record and, at a minimum, submit the

photos to the Court for an in-camera review under the Court's Brady/Giglio protocol. See

supra at 13, n.5. The prevously undisclosed photos undermine the testimony of Thomas

and Smith and therefore the derivative testimony of SSA George. It is difficult, if not

impossible, to compare the day planner sketches with the photos and see a correlation

between the drawings and the hospital site, a problem magnified by the disclosure in the

September 3, 2002 e-mail that Smith had advised that he, the FBI Legat, an FBI agent

from Detroit, and an AUSA went to visit the airport and hospital with the sketch but

could not establish which site (if either) the sketch referred to[11]. (Copies of both are

---

[10]   There is no evidence that AUSA Corbett, SA's Brennan and George, or Ray Smith knew there were photos.

[11]   Thomas has also stated to the Public Integrity investigators that the Jordanians initially believed that the sketch was of the Queen Alia Airport and not the hospital. Thomas did not reveal this fact to the jury. Indeed, his testimony seemed to suggest that the Jordanians focused on the hospital from the start: "We presented this document to the Jordanians. They said we believe this is the military hospital. There's three items here in Jordan that have the name Queen Alia attached to it: Queen Alia Airport, the Queen Alia Hotel and the Queen Alia Military Hospital." Likewise, when Smith was asked on direct examination why they went to the Airport first, he sidestepped the question, responding that "one of the reasons" they went to this location

-23-

attached to this memorandum.) Of course, it is possible that the site may have

substantially changed between the time Thomas and Convertino viewed it (December

2001/early March 2002) and the time the photos were taken (September 2002). But given

the Court's protocol, an argument that the photographs need not be produced due to

"changed circumstances" should have been made to the Court.

While litigating this issue at a new trial hearing would pit government witness

against government witness on issues of knowledge, intent and willfulness, it would not

change the fact that the e-mails and photos could have been located and provided to the

defense through reasonable diligence.[12]  AUSA Convertino's lawyer has notified

undersigned government counsel, via hypothetical proffer, that it is Convertino's position

that while in Jordan he asked about photos, but was told by the GID and the RSO (Smith)

that they could not obtain photos. Convertino continued to press for photos, but the State

---

(i.e., the Airport) was because it had "Queen Alia" in its name.  11 Tr. 1771-72.  This answer
failed to address why they visited the airport first, before the hotel or the hospital which were
also named after Queen Alia.  Likewise, when asked on cross-examination whether the airport
was the Jordanian's first suggestion upon looking at the sketch, Smith gave the same type of
response: "I think because the airport was Queen Alia Airport.  And from my understanding
Arabic on this page [i.e., the sketch] said Queen Alia, they wanted to check the airport out and
make sure it wasn't a match."  Id. at 1805."

[12]     Although Seitz claims he gave Thomas two different sets of the photos, SA
Thomas failed to enter the photos into the FBI's evidence files.  Thomas denies receiving two
sets and claims that he had planned to enter the photos into the FBI evidence file digitally, but
Seitz never gave him the disk.  Thomas says that he last saw the photos in the trial preparation
room and speculates that paralegal Ana Bruni may have thrown them away after trial.
Interestingly, SA Brennan, AUSA Keith Corbett (Convertino's supervisor), and SSA Paul
George all claim that they were never told of the existence of the photos.  The disappearance of
these photos that the prosecution team sought so diligently to acquire would be difficult for the
government to explain at a new trial hearing.